UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LISA M. CRISTIA, | ) |
| | ) |
| Plaintiff, | ) No. 07 C 601 |
| | ) |
| v. | ) Judge John W. Darrah |
| | ) |
| RED DOOR SPA HOLDINGS d/b/a | ) |
| ELIZABETH ARDEN, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lisa M. Cristia, filed suit against Defendant, Red Door Spa Holdings, alleging discrimination in violation of the American with Disabilities Act ("ADA"). Presently before the Court is Red Door's Motion for Summary Judgment.

## BACKGROUND

Cristia was hired as a massage therapist in June 1998 at Mario Tricoci, a hair salon and day spa, at its Oak Brook, Illinois location. (Def.'s 56.1(a)(3) Statement ¶ 5). In 2001, Red Door purchased Mario Tricoci. (Id., ¶ 7). That same year, Cristia began "picking-up" massage therapy shifts at Red Door's 919 N. Michigan Avenue location ("Michigan Ave."). After several months of picking-up shifts at Michigan Ave., Cristia transferred to that location. (Id., ¶ 9).

A few months after her transfer, Cristia was promoted to Body Department Manager. (Def.'s 56.1(a)(3) Statement ¶ 11). In that position, Cristia reported to the assistant general manager and the general manager. (Id., ¶ 12). At that time, the general manager of Michigan Ave. was Yolanda Rodgers. (Id., ¶ 14). On April 28, 2003, Peggy Lofgren became the general manager of Michigan Ave. (Id., ¶ 15). The general manager reported to the Regional Vice-President, Kirk Marlow. (Id., ¶ 13).

After April 2003, Cristia applied for, and received, the additional position as Red Door's Midwest Regional Trainer. (Def.'s 56.1(a)(3) Statement ¶ 16). As the Midwest Regional Trainer, Cristia trained massage therapists at salons in the Midwest region on new massages, new massage protocols, and any other body treatments. (Id., ¶ 18).

In August 2003, Cristia was diagnosed with tongue and throat cancer. (Def.'s 56.1(a)(3) Statement ¶ 20). Almost immediately after her diagnosis, Cristia called Lofgren and told her about the diagnosis. (Id., ¶ 21). At that time, Cristia knew that her cancer would be treated surgically; and she spoke with Lofgren and Red Door's benefits department regarding leave for the surgery. (Id., ¶ 22). Red Door gave Cristia leave under the Family and Medical Leave Act of 1993 ("FMLA"), as well as personal leave, for the time off she needed for surgery and recovery. (Id., ¶ 23). Lofgren and Marlow approved Cristia's FMLA and personal-leave requests. (Id., ¶ 24).

Initially, Cristia planned to return to work in December 2003. (Def.'s 56.1(a)(3) Statement ¶ 25). In December 2003, Cristia spoke with Marlow and requested additional leave. (Id., ¶ 26). Marlow informed Cristia that there was no need to hurry back to work and that if she needed to take more time to recover, she could do so. (Id., ¶ 27). Cristia's FMLA and personal leave was extended to January 2004. (Id., ¶ 28).

When Cristia returned to work the week of January 11 - 18, 2004, she returned to her same positions, same job duties, and same pay. (Def.'s 56.1(a)(3) Statement ¶ 29). Lofgren was Cristia's supervisor when she returned. (Id., ¶ 30). That same week, Cristia received a promotional award for bringing in a large amount of retail business. (Id., ¶ 33).

In March 2004, Cristia requested, and received, another week of leave for a second cancer-related surgery. (Def.'s 56.1(a)(3) Statement ¶¶ 34 - 35). In May 2004, Cristia took another month of FMLA and personal leave for gall bladder surgery. (Id.., ¶ 37). Cristia's medical and personal leave for her two cancer surgeries and gall bladder surgery were all taken within the same twelve-month period from September 2003 to August 2004. (Id., ¶39). Cristia returned to work to the same title, duties, and pay after each leave. (Id., ¶ 40).

When Cristia was hired, she weighed 250 pounds. (Def.'s 56.1(a)(3) Statement ¶ 43). Cristia weighed the same at the time of her two promotions. (Id., ¶ 45). At the time of employment termination with Red Door, Cristia weighed 240 pounds. (Id., ¶ 46). Cristia felt intimidated by Lofgren because of her weight because Lofgren once commented that Lofgren's belly was large because she was pregnant and Cristia's belly was fat. In addition, Lofgren wanted Cristia to wear her shirt tucked into her pants because Lofgren felt that Cristia looked sloppy. (Plaint.'s 56.1(b)(3) Statement ¶ 29). Lofgren also would tell Cristia not to be behind the front desk while other managers were allowed behind the front desk. (Id., ¶ 31).

Cristia has also been diagnosed with Hashimoto's disease. (Def.'s 56.1(a)(3) Statement ¶ 47). According to Cristia, Hashimoto's disease causes her to be tired and sluggish and contributes to her weight. (Id., ¶ 48). During her employment with Red Door, Cristia did not request time off due to Hashimoto's disease. (Id., ¶ 51). Neither Marlow nor Lofgren knew Cristia had been diagnosed with Hashimoto's disease until after her employment with Red Door had been terminated. (Id., ¶ 52). The only information Cristia's physician provided related to Cristia's Hashimoto's disease was in a January 26, 2006 letter, more than a year after Cristia's employment with Red Door was terminated. (Id., ¶ 49).

Cristia made two weight-related requests of Red Door during her employment. (Def.'s 56.1(a)(3) Statement ¶ 53). First, when Cristia began working at Michigan Ave., she requested, and received, the largest massage room. (Id., ¶¶ 54-55). Second, Cristia asked for, and received, an exception to the Michigan Ave. dress code. (Id., ¶ 56). In July 2003, Lofgren asked Cristia to start wearing her polo shirt tucked into her pants. (Id., ¶ 58). Cristia told Lofgren that she was wearing the polo shirt provided by Red Door and that she did not think she looked sloppy. (Id., ¶ 59). After her conversation with Lofgren, Cristia called Marlow and told him that she was uncomfortable wearing her shirt tucked into her pants because it accentuated her weight and impeded her ability to massage clients. (Id., ¶ 60). Marlow told Cristia to follow Lofgren's instructions. Cristia then called Janet Denyer, Red Door's Vice President of Operations, and explained why she did not want to tuck her shirt into her pants. (Id., ¶ 61). Denyer told Cristia that Cristia did not have to wear her shirt tucked into her pants. (Id., ¶ 62).

Cristia has "a little bit" of hearing loss in her left ear, and she had trouble speaking immediately following her cancer surgery. (Def.'s 67.1(a)(3) Statement ¶ 119). Cristia is sometimes tired and sluggish while working, but she does believe that she could perform the majority of jobs for which she is qualified. (Id., ¶ 120). Cristia also gags on occasion while brushing her teeth and eating and reports some trouble breathing while sleeping. (Id., ¶ 121). Cristia has no trouble seeing, walking, cooking, cleaning, shopping, brushing her hair, dressing herself, bathing herself, performing manual tasks around the house and yard, paying bills, traveling, socializing, learning or remembering. (Id., ¶ 122).

In 2003, Red Door completed Cristia's first employee evaluation as Body Department Manager. (Def.'s 56.1(a)(3) Statement ¶ 64). On this Performance Summary, Cristia received an overall score of 2.69. (Id., ¶ 65). Cristia received "2" scores ("Needs Improvement") on four areas: Communications, Management, Problem Solving and Decision Making, and Analytical. (Id. ¶ 66). Comments Cristia received for Communications included:

> Verbal communication can sometimes be abrupt and quick in conversation and not always in a private area. Written communication may also seem a bit abrasive and to the point. Sometimes even offensive to staff. Sometimes tries to be involved in other departments instead of her own.

(Id., ¶ 67). Comments Cristia received for Problem Making and Decision Making included: "[did] not always use sound judgment when making decisions regarding disciplinary action. Sometimes personal feelings may play a part in decision-making." (Id., ¶ 68). Cristia received a score of 2.5 in the categories of Functional, Initiative, Teamwork, and Performance Management. (Id., ¶ 69). Comments in the Teamwork category reminded Cristia to "Be aware of personal conversations with staff." (Id., ¶ 70). Comments in the Performance Management section included: "Lisa understands the expectations needed in her department but does not always communicate them to the staff in an appropriate manner. Feedback can be negative or abrupt." (Id., ¶ 71). Cristia received two scores of "3" ("Successful") in the 2003 Performance Summary in the categories of Planning/Organizing/Time Management and Computer. (Id., ¶ 72).

Upon receiving her 2003 Performance Summary, Cristia called Marlow and told him that she was upset about being evaluated on things she did not know she needed to do, such as having Microsoft Word and Excel experience, coming up with budgets for spending, making sales plans, and taking into account stock levels. (Def.'s 561.(a)(3) Statement ¶¶ 73-74). Cristia also completed

5

a self-evaluation to accompany her 2003 Performance Summary. (Id., ¶ 76). In her self-evaluation, the lowest score Cristia gave herself was a "3" in Communications. (Id., ¶ 77). She commented on the self-evaluation under Communications, "I think that I've tried in the past and was successful. However, as of late, I feel that my communication w/staff has been failing on some level. I'm not getting them to understand." (Id., ¶ 78).

Between June 2004 and January 2005, Lofgren discussed professionalism issues with Cristia. (Def.'s 56.1(a)(3) Statement ¶ 80). This included speaking to Cristia about Cristia's decision to confront a Red Door massage therapist who had taken a position at another local spa. (Id., ¶ 81). Lofgren also spoke with Cristia about Cristia's discussions with staff-level employees about personal issues, such as intimate relationships. (Id., ¶ 86). Lofgren explained to Cristia that while non-managerial employees may discuss these topics, it was not acceptable for management to do the same because they are held to a higher standard. (Id., ¶ 87). Cristia admits that she shared details of her personal life with subordinate employees. (Id., ¶ 88).

On December 30, 2004, Cristia had a birthday party to which she invited some of her subordinates and other co-workers. (Def.'s 56.1(a)(3) Statement ¶ 97). When one of Cristia's subordinates, massage therapist Geneva Bragg, did not attend the party, Cristia called Bragg at her home. (Id., ¶ 98). Cristia asked Bragg why she was not at the party, and Bragg told Cristia that she was tired. (Id., ¶ 99). Cristia also telephoned another Red Door employee who had left the party early and left a phone message referring to the employee's decision to leave the party as "rude, cruel, and selfish." (Id., ¶¶ 101-104).

On or about January 5, 2005, Lofgren learned of the above telephone calls, as well as others, Cristia made to Red Door employees regarding the birthday party. (Def.'s 56.(a)(3) Statement ¶ 107). Based on her review of the telephones calls, which she found intimidating and harassing, Lofgren decided to terminate Cristia's employment. (Id., ¶ 111). Lofgren determined that because Cristia was a member of Red Door management, her unprofessional conduct could not be ignored. (Id., ¶ 112).

Red Door terminated Cristia's employment on January 19, 2005. (Def.'s 56.1(a)(3) Statement ¶ 13). Lofgren terminated Cristia's employment because of Cristia's discourtesy or inappropriate, disruptive behavior and other breaches of Red Door's rules of conduct, specifically using her management position to coerce employee actions and harassment. (Id., ¶ 114). These reasons for termination are exceptions to Red Door's progressive discipline policy. (Id., ¶ 115). Red Door has not retained any employee who engaged in conduct similar to Cristia's conduct. (Id., ¶ 116). In March 2005, Cristia began working for Midwest Athletic Club as a massage therapist. (Id., ¶ 123).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (*Celotex*). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

Defendant first argues that Cristia's ADA claim fails because she is not "disabled" as defined by the ADA.

The ADA prohibits employers from discriminating against an employee because of her disability and requires employers to make reasonable accommodations for the disabilities of qualified individuals. *See Timmons v. General Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006) (*Timmons*). A plaintiff alleging discrimination under the ADA must first establish the threshold requirement that she has a disability as defined by the ADA. *See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). Under the ADA, an individual is disabled if she (a) has "a physical or mental impairment that substantially limits one or more . . . major life activities"; (b) has "a record of such an impairment"; or (c) is "regarded as having such an impairment." 42 U.S.C. § 12102(2). If an individual's condition does not rise to the level of a disability, the individual cannot recover under the ADA even if the employer terminated the individual on the account of the condition. *See Skorup v. Modern Door Corp.*, 153 F.3d 512, 514 (7th Cir. 1998) (*Skorup*).

The determination of whether a person has a disability under the ADA is made on an individualized case-by-case basis. *Bryne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir. 1992). This determination is made through a three-step process: (1) whether the individual suffers from a "physical or mental impairment", (2) whether the life activity on which the individual relies upon

is a "major life" activity, and (3) whether the impairment "substantially limits" that major life activity. See *Bragdon v. Abbott*, 524 U.S. 624, 531, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998) (*Bragdon*).

The ADA authorizes the Equal Employment Opportunity Commission (EEOC) to issue regulations to implement Subchapter I of the ADA (42 U.S.C. § 12116) and the Attorney General (Department of Justice ("DOJ")) to issue regulations to implement the provisions of Subchapter III of the ADA (42 U.S.C. §12186(b)). The DOJ defines the phrase "physical or mental impairment" as "[a]ny mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 28 C.F.R. § 35.104 (1999). Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, learning, and working. This list is illustrative, not exhaustive. See *Bragdon*, 524 U.S. at 638-39, 118 S. Ct. 2196, 141 L. Ed. 2d 540; 45 C.F.R. § 84.3.(j)(2)(ii) (1999).

The ADA regulations define "substantially limited" as: "[s]ignificantly restricted to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. 1630.2(j)(1)(ii) (1999).

Three factors are analyzed for determining whether a person's impairment substantially limits a major life activity: (1) the nature and severity of the impairment, (2) the duration of the impairment, and (3) the permanent or long-term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *Furnish v. SVY Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001). The positive and

negative effects of any corrective measures must also be taken into account when determining whether a person is substantially limited in a major life activity. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999).

Cristia contends that she is disabled because of her obesity and cancer. Other than a conclusory statement that she is disabled because of her cancer and weight, Criteria provides no undisputed facts or argument to support her claim of being disabled under the ADA. The undisputed facts fail to support a claim that Cristia has a physical impairment that prevents her from performing a major life activity. To the contrary, Cristia concedes that she has no trouble seeing, walking, cooking, cleaning, shopping, brushing her hair, dressing herself, bathing herself, performing manual tasks around the house and yard, paying bills, traveling, socializing, learning or remembering. She was also able to perform her duties as a massage therapist both before and after her cancer and surgery and during the time she was "obese." Furthermore, the minor conditions Cristia experiences – sometimes being tired and sluggish while working, gagging on occasion while brushing her teeth and eating, and some trouble breathing while sleeping – do not constitute a condition that substantially limits a major life activity.

Nor has Cristia demonstrated that Red Door regarded her as having an impairment that substantially limited a major life activity.

It is not enough for Cristia to show that Red Door was aware of her impairment; instead, she must show that Red Door knew of the impairment and believed that she was substantially limited because of it. *See Skorup*, 153 F.3d at 515. Accordingly, Cristia must show that Red Door believed she was unable to work a particular class or broad range of jobs. *See Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 955 n. 7 (7th Cir. 2000) (*Moore*); *Skorup*, 153 F.3d at 515.

Cristia fails to point to any evidence that Red Door perceived her as impaired in performing a broad range of jobs in various classes. Instead, the undisputed facts demonstrate that Cristia was hired and promoted while she was at the same weight, or more, than when she was fired. Cristia received leave for her cancer treatments and surgeries and does not identify any undisputed fact demonstrating that Red Door found her cancer and its required treatment and surgeries as impairing her ability to work.

Based on the above, Cristia has failed to establish that she is disabled under the ADA; and her ADA claim fails.

Even if Cristia could demonstrate she was disabled under the ADA, she also fails to demonstrate a *prima facie* case of discrimination or that Red Door's legitimate, nondiscriminatory proffered reason for termination was a pretext to discrimination.

Cristia first argues that Red Door failed to engage in an inactive process to determine what reasonable accommodations were possible.

The duty to provide a reasonable accommodation requires an employer to engage in an interactive process with the disabled employee needing the accommodation so that, together, the employer and employee can identify the employee's needs and discuss accommodation options. *See Emerson v. Northern States Power Co.*, 256 F.3d 506, 515 (7th Cir. 2001) (*Emerson*). "However, an employer's failure to engage in the interactive process or causing the process to breakdown by itself is insufficient to support liability." *Emerson*, 256 F.3d at 515. Instead, "the (only) consequence of the employer's failing to consult with the employee concerning a possible

accommodation of the employee's disability is to shift the burden of production [of evidence] concerning the *availability* of a reasonable accommodation from the employee to the employer." *Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002).

Cristia's failure-to-accommodate argument fails because Red Door did provide accommodations to Cristia as to both her cancer and resulting operations and her obesity by approving her medical leave and assuring that she returned to the same position with the same duties and pay. Red Door also provided her the largest room and allowed her to wear her clothing as she desired. Therefore, Red Door did engage in an interactive process as required by the ADA.

Cristia also argues that she has demonstrated direct and indirect evidence of discrimination under the ADA.

A plaintiff must prove her claims under Title III of the ADA either through direct or indirect evidence of discrimination. *Rotham v. Emory Univ.*, 123 F.3d 446, 451 (7th Cir. 1997). Under the direct method of proof, a plaintiff may show, either by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by an impermissible purpose. Direct evidence is evidence that proves discriminatory conduct by the employer without reliance on inference or presumption. *See Gusewelle v. City of Wood River*, 374 F.3d 569, 574 (7th Cir. 2004) (*Gusewelle*). Circumstantial evidence is evidence sufficient to create a convincing mosaic that allows a fact-finder to infer intentional discrimination by the decision-maker. *See Gusewelle*, 374 F.3d at 574. Such circumstantial evidence must "point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Store, Inc.*, 324 F.3d 935, 939 (7th Cir. 2004) (*Adams*).

Cristia relies upon the timing of her termination and her leave for cancer surgeries as circumstantial evidence of discrimination. However, Cristia returned to work in early January 2004 after her first surgery, a year before her termination. She returned to work in March 2004 after her second surgery, several months before her termination.

Circumstantial evidence under the direct method of proof can include suspicious timing. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004) (*Buie*); *King v. Preferred Technical Group.*, 259 F.3d 887, 893 (7th Cir. 1999) (*King*). However, suspicious timing, in and of itself, is not generally sufficient to find a finding of a discriminatory cause; but it can suffice where the adverse action followed on the heels of the employer's discovery of protected conduct. *See King*, 166 F.3d at 893 (temporal proximity created an issue of fact where employee's termination occurred one day after she finished her FMLA leave). However, in this case, more than a year from the first surgery and several months after the second had passed before Cristia's termination. Thus, the timing of Cristia's termination does not constitute circumstantial evidence of discrimination.

To prove discrimination under the indirect method, a plaintiff must prove that she: (1) is disabled within the meaning of the ADA, (2) was performing her job responsibilities satisfactorily, (3) was subjected to an adverse job action, and (4) was treated less favorably than non-disabled similarly situated employees. *See Timmons*, 469 F.3d at 1126. If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision. If the employer succeeds, then the burden shifts back to the plaintiff to show that there is a genuine issue of material fact that the proffered reason for the employment action is pretextual. *See Timmons*, 469 F.3d at 1126. To demonstrate pretext, a plaintiff must show that the employer's explanation is unworthy of credence or that a discriminatory reason more likely

motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995).

Here, Cristia has failed to demonstrate that she was performing her job responsibilities to Red Door's satisfaction because she engaged in misconduct by telephoning other employees, including subordinates, in an intimidating and harassing manner following her birthday party. She also had discussions with her supervisor regarding other conduct in late 2004 that Lofgren found unprofessional. Furthermore, she has failed to demonstrate that these legitimate proffered reasons were a pretext to discrimination.

While Cristia disputes whether the phone calls to other Red Door employees were sufficient to cause her termination, she does not dispute that the telephone calls were made. In essence, Cristia questions Red Door's judgment in terminating her employment for the telephone calls; however, this Court does "not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation." *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005).

Based on the above, Cristia has failed to demonstrate she suffered discrimination by Red Door in violation of the ADA.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted.

Dated: March 18, 2008

JOHN W. DARRAH
United States District Court Judge

14